UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SYLVESTER GAVIN,

                                    CASE NO. 2:08-CV-11763-DT
                Plaintiff,          JUDGE DENISE PAGE HOOD
                                    MAGISTRATE JUDGE PAUL J. KOMIVES

v.

CHERYL BRADSHAW,
KELLY O'DELL and
SANDRA ABOOD,

                Defendants,

_____/

**REPORT AND RECOMMENDATION REGARDING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. Ent. 16)**

*Table of Contents*

I.    RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
      A.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
      B.    Defendants' Motion for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
      C.    Fed. R. Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
      D.    Plaintiff's Factual Allegations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
            1.    The August 8, 2007 notice of package/mail rejection of $150.00 money order  . . . . . . 6
            2.    The September 4, 2007 notice of package/mail rejection of $100 money order . . . . . . 9
            3.    The October 24, 2007 major misconduct ticket . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
      E.    Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
            1.    Defendants' Affidavits  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
            2.    Plaintiff's Fourteenth Amendment claims do not survive summary judgment. . . . . . . 16
            3.    Defendants are not entitled to summary judgment on plaintiff's First Amendment claim
                  against Bradshaw. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
            4.    Defendants are entitled to summary judgment on plaintiff's Eighth Amendment claims.
                  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
            5.    The Eleventh Amendment bars some of plaintiff's claims, and defendants are not entitled
                  to qualified immunity with regard to plaintiff's First Amendment retaliation claim. . . 42

III.  NOTICE TO PARTIES REGARDING OBJECTIONS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

I.   **RECOMMENDATION:**  The Court should grant in part and deny in part defendants' motion for summary judgment.  Doc. Ent. 16.  Specifically, the Court should grant summary judgment as to plaintiff's Fourteenth Amendment and Eighth Amendment claims but should deny summary judgment as to plaintiff's First Amendment claim.

II.   **REPORT:**

A.   **Introduction**

Plaintiff is incarcerated at the Ionia Maximum Correctional Facility (ICF), where he is serving a life sentence for a violation of Mich. Comp. Laws § 750.316 ("First degree murder; penalty; definitions.").  He originally filed this case on April 16, 2008 in the Western District of Michigan.  Case No. 1:08-cv-00352-RHB-JGS.[1]  On April 24, 2008, Magistrate Judge Scoville entered an order transferring the case to the Eastern District of Michigan.  Doc. Ent. 4.

Plaintiff's complaint, filed in this Court on April 28, 2008, names as defendants Cheryl Bradshaw, Kelly O'Dell and Sandra Abood, each of whom are described as employees of the Southern Michigan Correctional Facility (JMF).  Doc. Ent. 1 at 4.  Plaintiff's complaint is based upon the First, Eighth and Fourteenth Amendments.  Doc. Ent. 1 at 7 ¶ 1.  His claims largely relate to three events: (1) an August 8, 2007 notice of package/mail rejection and the related administrative hearing; (2) a September 4, 2007 notice of package/mail rejection and the related administrative hearing; and (3) an October 24, 2007 major misconduct ticket.  Doc. Ent. 1 at 7-23.

---

[1]Plaintiff also filed a Rule 38(b) demand for jury trial (Doc. Ent. 3) and an application to proceed without prepayment of fees and affidavit (Doc. Ent. 2).

Plaintiff seeks punitive damages from each defendant "for their intentional and deliberate behavior designed to violate [his] protected 1st, 8th and 14th Amendment rights."  Doc. Ent. 1 ¶ 68.  Plaintiff also seeks compensatory damages from each defendant "for their wrongful[ly] depriving [him of] the use of his $150.00 and $100.00 money orders."  Doc. Ent. 1 ¶ 69.  He also seeks an award of reasonable costs and attorney fees.  Doc. Ent. 1 ¶ 70.  Finally, plaintiff claims he has "alleged facts illustrating respondents['] malicious, culpable enterprise entitling him [to] just compensation for the use of his property by respondents at an amount of 7% daily interest." Doc. Ent. 1 ¶ 72.**[2]**

## B.    Defendants' Motion for Summary Judgment

Judge Hood has referred this case to me for pretrial matters.  Doc. Ent. 9.  On November 26, 2008, defendants filed a motion for summary judgment by which they seek dismissal of this lawsuit.  Doc. Ent. 16 at 1.  Defendants argue that (I) "defendants did not violate the plaintiff's due process, and he has adequate state-law remedies[,]" (II) "defendants did not violate the plaintiff's First Amendment rights[,]" (III) "defendants did not violate the plaintiff's Eighth

---

[2]On May 21, 2008, Magistrate Judge Whalen entered an order waiving prepayment of the filing fee and directing payment of the initial partial filing fee and subsequent payments.  Doc. Ent. 6.  On July 9, 2008, Magistrate Judge Whalen entered an order directing service without prepayment of costs and authorizing the U.S. Marshal to collect costs after service is made.  Doc. Ent. 7.

The U.S. Marshal received three copies of the complaint on July 24, 2008.  Doc. Ent. 8.  Two of the three waivers of service were returned executed and required answers to be filed by September 29, 2008.  Doc. Entries 10-12.

On August 21, 2008, the Attorney General entered an appearance on behalf of all *three* defendants.  Doc. Ent. 13.  On September 25, 2008, defendants filed a motion for enlargement of time in which to respond to the complaint.  Doc. Ent. 14.  On September 26, 2008, I entered an order granting the motion and providing that a response was due on or before November 30, 2008.  Doc. Ent. 15.

Amendment rights[,]" and (IV) "defendants are entitled to Eleventh Amendment and qualified immunities."  Doc. Ent. 16 at 10-16.

On December 23, 2008, plaintiff filed a response.  Doc. Ent. 17.  In addition to addressing defendants' arguments, plaintiff describes the atmosphere at JMF "which formed the basis of this lawsuit."  Doc. Ent. 17 at 2-4.

**C.     Fed. R. Civ. P. 56**

Summary judgment, pursuant to Fed. R. Civ. P. 56, may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

> A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties.

*Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (citing *Johnson v. Soulis,* 542 P.2d 867, 872 (Wyo. 1975) (quoting BLACK'S LAW DICTIONARY 881 (6th ed.1979)).  "In evaluating a motion for summary judgment we view all evidence in the light most favorable to Plaintiff . . . and assess the proof to determine whether there is a genuine need for trial."  *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1045 (6th Cir. 1998) (citations omitted).

The movant bears the burden of demonstrating the absence of all genuine issues of material fact.  *See Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 861 (6th Cir. 1986).  The moving party need not produce evidence showing the absence of a genuine issue of material fact. Rather, "the burden on the moving party may be discharged by 'showing' – that is, pointing out

to the district court – that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the moving party discharges that burden, the burden shifts to the non-moving party to set forth specific facts showing a genuine triable issue.  Fed. R. Civ. P. 56(e); *Gregg*, 801 F.2d at 861.

"Although the nonmoving party 'may not rest upon the mere allegations or denials' of his pleading, Fed. R. Civ. P. 56(e), a verified complaint . . . satisfies the burden of the nonmovant to respond." *Thaddeus-X v. Blatter*, 175 F.3d 378, 385 (6th Cir. 1999).[3]  "[A] verified complaint . . . would have the same force and effect as an affidavit and would give rise to genuine issues of material fact."  *Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992).  However, "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Fed. R. Civ. P. 56(e).  *See also Hamilton v. Roberts*, No. 97-1696, 1998 WL 639158, *5 (6th Cir. Sept. 10, 1998) (personal knowledge required); *Daniel v. Cox*, No. 96-5283, 1997 WL 234615, *2 (6th Cir. May 6, 1997) (conclusory assertions are insufficient for purposes of surviving summary judgment); *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994) (citing *Daily Press, Inc. v. United Press Int'l*, 412 F.2d 126, 133 (6th Cir. 1969)) (cannot consider hearsay evidence).

"Demonstration of simply 'metaphysical doubt as to the material facts' is insufficient." *Kand Medical, Inc. v. Freund Medical Products, Inc.*, 963 F.2d 125, 127 (6th Cir. 1992), citing

---

[3]Plaintiff certified that his complaint "is true and accurate based upon [his] knowledge, information, and belief."  *See* Doc. Ent. 1 at 23; 25 U.S.C. § 1746 ("Unsworn declarations under penalty of perjury").  The affidavit attached to plaintiff's response is also signed "under the pain of perjury[.]" Doc. Ent. 17 at 16-17.

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  As the

United States Supreme Court stated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986),

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for

a jury to return a verdict for that party.  If the [non-movant's] evidence is merely colorable, or is

not significantly probative, summary judgment may be granted."  *Id.* at 246-250 (citations

omitted); *see Celotex Corp.*, 477 U.S. at 322-23; *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 586-587 (1986).  The standard for summary judgment mirrors the

standard for a directed verdict under Fed. R. Civ. P. 50(a).  *Anderson*, 477 U.S. at 250.

Consequently, a non-movant must produce evidence that would be sufficient to require

submission to the jury of the dispute over the fact.

**D.     Plaintiff's Factual Allegations**

**1.     The August 8, 2007 notice of package/mail rejection of $150.00 money order**

According to plaintiff, his case was reviewed by Parole Board Member Stephen H.

DeBoer in July 2007 "in compliance with the Governor's desire to commute a number of life

sentences[.]" Doc. Ent. 1 at 20 ¶ 60.  Plaintiff states that "[a]t the conclusion of the parole board

interview, and it may be ironic, [he] had been specifically requested to inform the parole board

of any subsequent guilty finding of a major misconduct."  Doc. Ent. 1 at 20 ¶ 61.

On July 13, 2007, a $150.00 money order addressed to plaintiff arrived at JMF.  Doc.

Ent. 1 at 9 ¶ 11.  Plaintiff claims that Abood inspected the mail, and plaintiff was issued a mail

rejection based upon MDOC PD 04.02.105 ¶ J(6).  Doc. Ent. 1 at 10 ¶ 12.  Plaintiff requested an

administrative hearing, and O'Dell conducted it.  According to plaintiff, he was permitted "to

return the money order to his wife at [his] expense."  Doc. Ent. 1 at 10 ¶ 13.

6

On July 17, 2007, plaintiff sent mail to Mrs. Rosa M. Gavin, Post Office Box 453, Grand Rapids, Michigan.  Doc. Ent. 1-2 at 11.  According to plaintiff, his use of "Grand Rapids" was inadvertent, and he should have used "Twin Lake."  Doc. Ent. 1 at 10 ¶ 14.  It appears the mail was processed through Lansing, Michigan on August 1, 2007.  Doc. Ent. 1-2 at 11.  On August 3, 2007, plaintiff completed a prisoner kite stating that his wife "has not received the returned money order."  On or about August 6, 2007, T. Grant informed plaintiff that the money order "was sent on [August 1, 2007] in [a] metered envelope."  Doc. Ent. 1-2 at 12.

According to plaintiff, the mis-addressed envelope was returned to the sender as undeliverable.  Doc. Ent. 1 at 10 ¶ 15.  On August 8, 2007, plaintiff received a notice of package/mail rejection (#2613) from Abood regarding a "[m]oney order from an unidentified source [in the amount of] $150.00 . . . dated 7-5-2007."  The sender is listed as Gavin, 4010 Cooper Street, Jackson, MI 49201.  *See* MDOC PD 04.02.105.  Plaintiff requested a hearing.  Doc. Ent. 1-2 at 2.  He also claims he asked for "a copy of the envelope the money order initially arrived at JMF and a copy of the $150.00 money order."  Doc. Ent. 1 at 10 ¶ 16.  Plaintiff wrote to the mailroom, asking for an explanation as to "how this money order found its way back to this facility."  The following day, T. Grant explained that "[o]n [August 8, 2007] it came back[.]"  Doc. Ent. 1-2 at 13.  This is consistent with the "Return to Sender" stamp on the envelope.  Doc. Ent. 1-2 at 11.

On August 20, 2007, O'Dell conducted an administrative hearing on the contraband and found that the "[m]oney must be turned over to the PBF (Prisoner Benefit Fund), per policy."  Doc. Ent. 1-2 at 3.  According to plaintiff, O'Dell "did not produce a copy of the requested initial envelope the money order arrived at the JMF or a copy of the money order, and did not provide a

7

reason for [the] absence of the requested evidence." Doc. Ent. 1 at 11 ¶ 17.[4] Furthermore,

plaintiff claims that O'Dell contacted Abood during the administrative hearing, and "Abood

informed []O'Dell that the money order must be placed in the Prisoner Benefit Fund, (PBF),

absent petitioner being privy to the evidence []Abood relied upon for her conclusion[.]" Doc.

Ent. 1 at 11 ¶¶ 19-20.

On August 22, 2007, plaintiff completed a Step I grievance form (**JMF-07-08-01329-**

**015a**) based upon the August 20, 2007 administrative hearing.  Doc. Ent. 1-2 at 4, 6.  Within the

grievance, plaintiff argued that "the source of the money order is not unidentifiable but had been

previously identified as being generated by my wife."  Doc. Ent. 1-2 at 6; Doc. Ent. 1 ¶ 28.

Plaintiff also stated that "to maintain impartiality, someone other than the mailroom should hear

this matter."  Doc. Ent. 1-2 at 6; Doc. Ent. 1 ¶ 29.  The Step I response is dated September 7,

2007.  The investigation information provided:

> Staff in the JMF mail room did send the envelope out as addressed by the
> grievance and did receive it as undeliverable.  Another rejection was issued and
> the grievant requested a hearing.  During the administrative hearing of August 20,
> 2007, ARUS O'[D]ell stated in his findings that the money must be turned over to
> the PBF, per policy.  He did not cite the funds policy, PD 04.02.105 "PRISONER
> FUNDS", specifically paragraphs L, M, and N and did not state a disposition of
> same.

Respondent C. Stanton summarized:

> Staff in the JMF mail room followed the above policy directive and processed the
> United States Postal Service money order for $150.00 . . . appropriately.  I have
> attached a copy of the money order and a copy of the Administrative Hearing
> Report held 8/20/07.  A copy of this response will be sent to the ADW of Housing
> to ensure that an amended administrative hearing report is completed.

---

[4]In a MDOC Memorandum dated July 3, 1997, and addressed to all wardens, Marjorie Van
Ochten, an Administrator at the Office of Policy and Hearings, wrote about physical evidence at
informal hearings.  Doc. Ent. 1 at 11 ¶ 18; Doc. Ent. 1-2 at 21-22; Doc. Ent. 17 at 24-25.

JMF-07-08-01329-015a.  Doc. Ent. 1-2 at 4, 7.  According to plaintiff, Stanton is the mailroom supervisor.  Doc. Ent. 1 ¶ 29.

On September 16, 2007, plaintiff completed a Step II grievance appeal form.  The Step II response is dated October 1, 2007.  Respondent J. Ocwieja requested that "O'Dell complete an amended hearing report[.]"  Ocwieja also stated that "[t]he policy violation which was found has been corrected with the return of the funds and subsequent rejection notice.  No other policy violations are found.  After the completion of the amended hearing report, no further action will be taken.  This grievance is denied."  Doc. Ent. 1-2 at 5, 8.

Plaintiff completed a Step III grievance appeal.  Among other things, plaintiff stated that "[t]he question is not whether []O'Dell made an error to allow me to return the money order, but, whether or not the source that generated the money order had been identified.  The answer is an overwhelming 'Yes.'  (The sender of the money order is my wife)."  Doc. Ent. 1-2 at 9.  Jim Armstrong's October 16, 2007 Step III response concluded that "[t]he grievance was processed in accordance with policy and procedure."  Doc. Ent. 1-2 at 10.

**2.      The September 4, 2007 notice of package/mail rejection of $100 money order**

On September 4, 2007, plaintiff received a notice of package/mail rejection (#2646) from Abood regarding a $100.00 money order dated August 29, 2007 "[n]ot believed to be that of the Sender."  The sender is listed as Rose Gavin, 412 Lewis, Caro, MI 49723.  The notice explains that the mail would not be delivered based upon "Section J, Item 4, Prisoner Funds - Prohibited Funds: Funds from an unidentified source (e.g., name of sender not provided, name provided believed not to be that of the sender)."  Doc. Ent. 1-2 at 14; Doc. Ent. 1 at 14 ¶ 35. On September

5, 2007, an envelope was sent to Rose Gavin, 412 Lewis, Caro, MI 49723 from JMF; however, it was returned to sender on September 8, 2007.  Doc. Ent. 17 at 28.

On September 10, 2007, plaintiff requested a hearing.  Doc. Ent. 1-2 at 14.  On or about September 20, 2007, O'Dell conducted an administrative hearing on the mail rejection.  Doc. Ent. 1 at 14 ¶ 36.  O'Dell found that "[t]he money order does appear to be from a source other than the person listed as the remitter.  It shall be deposited in the PBF.  This decision is made per PD 04.02.105 J #6[,]" and directed that the money be deposited in the PBF.  Doc. Ent. 1-2 at 15.  According to plaintiff, O'Dell informed plaintiff that "Abood had irrefutable evidence that would support that the $100.00 money order had been sent by a person other th[a]n [plaintiff's] wife."  Doc. Ent. 1 at 14-15 ¶ 37.  However, plaintiff alleges, "O'Dell did not produce the indisputable evidence of . . . Abood at the administrative hearing, above [plaintiff's] request that he be permitted to review the evidence to comment upon same."  Doc. Ent. 1 at 15 ¶ 38.  Over plaintiff's objections, O'Dell altered the reason for the rejection from MDOC PD 04.02.105 ¶ J(4)[5] to MDOC PD 04.02.105 ¶ J(6).  Doc. Ent. 1 at 15 ¶ 39.  The result of the administrative hearing "was to place the $100.00 money order in the PBF pursuant to [MDOC] PD 04.02.105J(6)."  Doc. Ent. 1 at 15 ¶ 40.

On September 26, 2007, plaintiff completed a Step I grievance form (**JMF-07-09-01474-007a**) based upon the September 2007 administrative hearing.  Doc. Ent. 1-2 at 16; Doc. Ent. 17 at 19-20.  Respondent Richard Cady's September 28, 2007 response states that "[n]o violation of

---

[5]Paragraph J(4) of MDOC PD 04.02.105 ("Prisoner Funds") states, "Funds known to be from a volunteer who is not authorized to send funds to the prisoner pursuant to PD 03.02.105 'Volunteer Services and Programs'.  The Warden shall be advised if such funds are received."  Doc. Ent. 16-6 at 3.

the policy [MDOC PD 04.02.105] nor AR [Administrative Rule 3310] is found.  No new evidence supports revisiting the disposition.  Grievance is being denied."  Doc. Ent. 1-2 at 16, 19.

On October 9, 2007, plaintiff completed a Step II grievance appeal form.  Ocwieja's October 22, 2007 Step II response states, "[n]o violation of policy or procedure is noted; however, []O'Dell will issue an amended hearing report which indicates the reason for the absence of the item at the hearing in accordance with Ms. VanOchten's memorandum dated July 3, 1997.  The result of the hearing stands, and this grievance is denied."  Doc. Ent. 1-2 at 17, 20; Doc. Ent. 17 at 23.

Plaintiff completed a Step III grievance appeal.  Doc. Ent. 1-2 at 17.  J. Armstrong's November 14, 2007 Step III grievance response denied the appeal, stating in part, "[t]he Grievance did not provide sufficient evidence to corroborate his allegations.  The Grievant has not provided any documentation that would support an error in this determination.  In addition, the record presented with the appeal does not suggest that further action is justified at this time."  Doc. Ent. 1-2 at 18; Doc. Ent. 17 at 21.

**3.      The October 24, 2007 major misconduct ticket**

On October 24, 2007, Bradshaw issued plaintiff a major misconduct report for an August 14, 2007 interference with administration of rules.  Doc. Ent. 1-2 at 23; Doc. Ent. 1 at 16 ¶ 43. Bradshaw described the violation as follows:

> In a correspondence dated 8-14-07, Prisoner Dickerson 99197 stated a money order for $100.00 should have been sent to prisoner Gavin 091669 using the return address of Rose Gavin 412 Lewis - Caro, MI 48723.  The money order arrived and was rejected by the mail room staff.  Prisoner Gavin, . . . was initially allowed to return to sender whom he identified as his wife, he provided the necessary address for this to happen, the address provided was the PO box of a

11

> person recognized as sending money orders under from a prisoner to other
> prisoners and not that of Gavin's wife.  Prisoner Gavin listed the wrong city in the
> address and it was returned to the facility.  Prisoner Gavin has filed grievances in
> an attempt to have the money order placed in his account or sent to the PO box of
> 453 Twin Lake, MI which is the PO box of Theresa Fowler.  Prisoner Gavin is
> well aware of his wife's address as well as the fact that the money order did not
> originate from his wife.  IDed by CMIS database.

Doc. Ent. 1-2 at 23; Doc. Ent. 17 at 26.

On the day the ticket was issued, plaintiff requested a hearing and a copy of the money order.  Doc. Ent. 1-2 at 23.  On October 30, 2007, plaintiff completed an investigation report in which he requested documents and answers to questions before the hearing on his misconduct ticket.  Doc. Ent. 17 at 29-30.  Bradshaw provided answers on or about November 1, 2007.  Doc. Ent. 17 at 31.  According to plaintiff, Bradshaw provided "an envelope used exclusively by staff members and not prisoners."  Doc. Ent. 1 at 17 ¶ 48.  On November 13, 2007, Hearing Officer T. Wolven conducted a hearing on the major misconduct ticket for interference with administration of rules and dismissed the charge on the basis that "[t]he reporter failed to allege the elements of this offense."  Doc. Ent. 1-2 at 24; Doc. Ent. 17 at 27.

Plaintiff claims that defendants "knew or should have know[n], that in compliance with the Governor's desire to commute a number of life sentences, [plaintiff's] case had been interviewed by Parole Board Member Stephen H. DeBoer, in July of 2007."  Doc. Ent. 1 ¶ 60. Plaintiff further claims that defendants "knew, or should have known, a guilty finding of a major misconduct most often result[s] in a continuance of the term of incarceration, and in [plaintiff's] case, he would not be interviewed by the parole board for another 5 years, at the minimum." Doc. Ent. 1 ¶ 62.

**E.      Analysis**

Plaintiff claims that Abood's behavior "was intentional and malicious with the designed purpose to harass, intimidate, and cause undue hardship through her arbitrary and capricious rejections of [his] money orders of $150.00 and $100.00."  Doc. Ent. 1 ¶¶ 63.  Also, plaintiff claims, O'Dell's behavior "was intentional and malicious with the designed purpose to harass, intimidate, and cause undue hardship through his arbitrary and [capricious] use of the administrative hearing procedure to substantiate . . . Abood's wrongful determination to permanently deprive petitioner of his $150.00 and $100.00 money orders."  Doc. Ent. 1 ¶ 64.  Finally, plaintiff claims that Bradshaw's behavior "was intentional and malicious with the designed purpose to intimidate, harass, and cause undue hardship by issuing [plaintiff] a major misconduct when she knew, or should have known, that no disciplinary violation had occur[r]ed and no fact in the matter would support the issuance of a major misconduct."  Doc. Ent. 1 ¶ 65.

**1.      Defendants' Affidavits**

**a.**      In her September 23, 2008 affidavit, Abood claims that "[o]n or about July 7, 2007, the JMF mailroom received three United States Postal Service Money orders[,]" two of which "listed the remitter as the prisoner[.]"  These two were rejected "as coming from an unidentified source."  Doc. Ent. 16-3 at 2 ¶ 3.  Although plaintiff's money order was intercepted, "the envelope was mistakenly sent to the housing unit[;]" therefore, Abood did not copy it.  Doc. Ent. 16-3 at 3 ¶ 4.  Gavin "requested that his money order be sent to Rosa Gavin, P.O. Box 453, Grand Rapids, MI, and he provided a self-addressed stamped envelope with that address on it."  Doc. Ent. 16-34 at 3 ¶ 5.  It was mailed out on July 17, 2007.  Doc. Ent. 1-2 at 11.  Later, plaintiff informed Abood that the city should have been Twin Lake, MI.  Doc. Ent. 16-3 at 3 ¶ 6.  Abood contends that "[t]he post office box that Gavin claimed was his wife's was actually the

P.O. Box used by Theresa Fowler, who was on the JMF watch list.  Fowler was listed in the

MDOC database as being the mother of prisoner Roger Lee Wade #184874, and she had been in

correspondence with another JMF prisoner, Rogers #182908."  Doc. Ent. 16-3 at 3 ¶ 7.  Having

discovered that the other rejection, which was heard at Pine River Correctional Facility (SPR),

resulted in a disposition to place the money into the PBF, Abood "reviewed policy and noted that

funds from an unidentified source were required to be put in the PBF."  Doc. Ent. 16-3 at 3 ¶ 8.

On or about August 8, 2007, the money order returned to the prison, marked "Return to

Sender."  Abood rejected it a second time.  "Because [she] knew that it was to go into the PBF

per policy, [she] highlighted the box 'Turn over to Prisoner Benefit Fund' on the rejection form."

Doc. Ent. 16-3 at 3-4 ¶ 9.  According to Abood, ARUS O'Dell "came up to the mailroom and

looked at copies of the money orders and envelopes[,]" before conducting a hearing.  Doc. Ent.

16-3 ¶ 10.

Abood states that "[o]n August 15, 2007, [she] received an email from inspector

Bradshaw asking staff to be on the lookout for the following money orders: Gavin - $100,

Washington - $100, Durr - $250, Gross - $180, and Rogers - $180."  Doc. Ent. 16-3 at 4 ¶ 11.

According to Abood, "[o]n September 4, 2007, [she] received three money orders that were all

sequential and mailed on the same day from the same post office in Saginaw.  All three had very

similar letters enclosed for prisoners Durr #223444, Gross #242518, and Gavin #091669.  The

next day, a money order came in for Rogers #182908; it was not sequential, but it did have a

similar letter. [Abood] rejected all four money orders as coming from a source not believed to be

that of the sender.  We never did receive a money order for prisoner Washington."  Doc. Ent. 16-

3 at 4 ¶ 12.  Then,

> On or around September 11, 2007, in an outgoing letter from prisoner Dickerson #099197 (an inmate on our watch list) to someone simply called "Breeze," was a note telling him to send the money order receipts to the names on the return address envelopes, except prisoner Gavin, who has a dead return address. In another outgoing letter, from prisoner Rogers to Theresa Fowler, P.O. Box 453 Twin Lakes, MI, also on our watch list, was a request for her to call "S Abood" and say that she sent a money order to T. Rogers and P. Durr, that she is a friend of Durr's grandmother, and that Mrs. Durr asked her to send her grandson a money order because she told her that she was sending one to Rogers and that she was on her way to the store. Rogers also informed Fowler to question me on how the money orders could be rejected from an unidentified source if hers and M[r]. Durr's return addresses were on the envelopes and also to let me know that she had the receipts for the money orders. Prisoner Rogers sent me a kite with pretty much the same story.

Doc. Ent. 16-3 at 4-5 ¶ 13. Abood further states that, "[b]ecause of the admissions that prisoner Durr's and prisoner Rogers's money orders were bought together and that Fowler had the receipts for both, and because prisoner Durr's money order was sequential to Gavin's and Gross's, I could conclude only that all four were linked to each other and to Fowler." Doc. Ent. 16-3 at 5 ¶ 14.

**b.**     In the September 23, 2008 affidavit, O'Dell states that, "[i]n late summer 2007, I received a Package/Mail Rejection Notice #2646.[6] The item rejected was a $150 money order sent to prisoner Gavin #091669. At the time, I was told very little about the reason for the rejection, as there was an investigation being conducted by Inspector Bradshaw. Not knowing the reason for the [initial, July 13, 2007] rejection, [O'Dell] allowed Gavin to send the money order back out." Doc. Ent. 16-5 at 2 ¶ 3. According to O'Dell, "[t]he money order was returned to JMF due to improper address, and it was rejected a second time. This time, I was given more information, and I conducted a new hearing. The new outcome was that the money order was

---

[6]Notice of package/mail rejection #2646 is dated September 4, 2007 and refers to a $100.00 money order dated August 29, 2007. Doc. Ent. 1-2 at 14.

required to be turned over to the Prisoner Benefit Fund, per Policy Directive 04.02.105(J)(6)."

Doc. Ent. 16-5 at 2 ¶ 4.  O'Dell then states:

> The reason for the [September 2007][7] disposition was that Gavin's money order was one of four money orders that arrived at JMF that were bought at the same location, in consecutive order.  They arrived with a different remitter and different return address on each envelope.  The money orders were bought by one person who forged the remitted names and wrote fraudulent return addresses on the envelopes.  Three of the prisoners who were to receive these money orders were housed in my unit.  Aside from Gavin, there was Gross #242518 (rejection #2648) and Durr #223444 (rejection #2647).

Doc. Ent. 16-5 at 2-3 ¶ 5.[8]

**c.**      In her September 23, 2008 affidavit, Inspector Bradshaw states that plaintiff's alleged

wife "did not send the money orders in question in this suit[,]" and "did not rent a post office box

during the timeframe of the rejected money orders."  Doc. Ent. 16-4 at 2 ¶ 3.  Furthermore,

Bradshaw represents that she has "no interest or desire in punishing prisoner Gavin or any other

prisoner who exercises their rights. [She] had no reason or interest to intimidate, harass, and

cause undue hardship to prisoner Gavin by issuing him a false misconduct."  Doc. Ent. 16-4 at 2

¶ 4.  Also, Bradshaw explains,

> I wrote the misconduct ticket on Gavin because he was well aware that he did not address the outgoing envelope containing the money order to his wife.  The address that Gavin addressed the envelope to, P.O. Box 453, Twin Lake, MI, was a P.O. Box of a person known to the MDOC to facilitate prisoner to prisoner transfers of money, which is prohibited by prison policy.  However, Gavin mistakenly listed the city as Grand Rapids instead of Twin Lake, which resulted in the post office returning the envelope to the facility, where i[t] was rejected a

_____

[7]In ¶ 5 of her affidavit, O'Dell appears to refer to her August 20, 2007 administrative hearing report.  However, due to the detail offered in ¶ 5, the Court suspects O'Dell is referring to her September 2007 administrative hearing report.

[8]In the affidavit, O'Dell refers to the late summer 2007 package/mail rejection notice #2646 as related to a $150.00 money order (Doc. Ent. 16-5 at 2 ¶ 3); yet, notice #2646 actually relates to a $100.00 money order (Doc. Ent. 1-2 at 14).

second time.  Gavin asked to correct the address to reflect the correct city of Twin
Lake, but he was not permitted to do so.

Doc. Ent. 16-4 at 2-3 ¶ 5.

**2.      Plaintiff's Fourteenth Amendment claims do not survive summary judgment.**

There are at least two MDOC Policy Directives which are germane to plaintiff's

Fourteenth Amendment claims.  First, MDOC PD 04.02.105 (Prisoner Funds), effective

December 1, 2004, provides that "Correctional Facilities Administration (CFA) prisoner

institutional accounts shall be handled and monitored as set forth in this policy."  Doc. Ent. 16-6

at 2.  A portion of this policy directive, ¶¶ F-P, is dedicated to credits to prisoner institutional

accounts.  In pertinent part, the policy provides that, "[e]xcept if for the purchase of hobbycraft

pursuant to PD 04.03.102 'Resident Hobbycraft Programs', funds received from any of the

following sources shall not be credits: . . . 6.  Funds from an unidentified source (e.g., name of

sender not provided, name provided believed not to be that of the sender)."  Doc. Ent. 16-6 at 3

(MDOC PD 04.02.105 ¶ J(6)).  The policy also provides that "[f]unds found to have been

received from an unidentified source shall be placed in the Prisoner Benefit Fund (PBF)."  Doc.

Ent. 16-6 at 4 (MDOC PD 04.02.105 ¶ N).

Second, MDOC PD 04.02.110 (Prisoner Benefit Fund) provides that one of the sources

of revenue for the PBF is "[c]onfiscated prisoner funds and postage, including metered

envelopes[.]"  MDOC PD 04.02.110, ¶ E(4), effective 07/21/08.

**a.**      Plaintiff alleges a violation of his due process rights with regard to the August 20, 2007

administrative hearing.  Specifically, he states that his right to substantive due process was

violated when O'Dell accepted Abood's conclusionary statement in the absence of plaintiff's

knowledge or comment on the evidence and where the administrative hearing report fails to

17

mention "why the missing evidence had not been produced at [his] administrative hearing[.]" Doc. Ent. 1 ¶¶ 21, 22.  Plaintiff claims that because O'Dell's August 20, 2007 administrative hearing report "did not reflect the disposition of the hearing," "the second step respondent had an amended administrative report issued to reflect a disposition, absent [plaintiff's] presence[,]" but that "[t]his selective amendment does not reflect any reason why a copy of the initial envelope, and $150.00 money order had not been produced for the hearing."  Doc. Ent. 1 ¶¶ 23, 24.  It is plaintiff's position that he had "a due process right to review the initial envelope and money order to check the handwriting and compare with other letter he had received to shown an[d] identify[,]" and "the amending of the report and failure to produce the evidentiary items, denied him due process of law."  Doc. Ent. 1 ¶¶ 25, 26.  Plaintiff asserts that his "administrative hearing was a [travesty] of fairness and impartiality to which administrative hearings must commit themselves."  Doc. Ent. 1 ¶ 27.  He claims that "since the sender of the money order had been previously identified, and [an] attempt [was made to] return [it] to the sender, [MDOC] PD 04.02.105J(6) was no longer applicable because the source of the money order had been identified."  Doc. Ent. 1 ¶ 30.  Plaintiff contends that "[a]n agency must abide by it[s] rules and prior decisions, and the prior decision in this action was to return the money order to its source." Doc. Ent. 1 ¶ 31.  Plaintiff states he "has been arbitrarily and capriciously denied substantive due process throughout the administrative hearing and grievance procedure[;] [therefore,] he has an entitlement to have his $150.00 . . . money order returned and placed in his prison trust account." Doc. Ent. 1 ¶ 32.  He claims that "[t]he errors in this action reflect[] a blatant disregard for [his] substantive due process right that he should be awarded a 7% daily interest on his $150.00

because of [defendants'] arbitrary and capricious behavior and conduct in this action." Doc. Ent. 1 ¶ 33.

Plaintiff also alleges a violation of his due process rights with regard to the September 20, 2007 administrative hearing. He claims "[t]he errors in this action reflect[] an arbitrary and capricious, blatant disregard for [plaintiff's] substantive due process right that he should be awarded a 7% daily interest on his $150.00 and $100.00 monies because of arbitrariness [defendants'] behavior and conduct in this action." Doc. Ent. 1 ¶ 41.

With respect to the October 24, 2007 major misconduct ticket, plaintiff claims that "Bradshaw knew that [he] had not caused, or attempted, to have any staff member, or prisoner, disciplined by making false accusations against any staff member or prisoner." Doc. Ent. 1 ¶ 45. Plaintiff challenges the veracity of Bradshaw's description of the violation, "because [he] had never attempted to return a $100.00 money order to any location." Doc. Ent. 1 at 17 ¶ 46. According to plaintiff, "Bradshaw was asked to provide a copy of the envelope in which the $100.00 [money] order had been attempted to be returned, and [Bradshaw] provided a copy of an envelope indicating it had been undeliverable by the postal services." Doc. Ent. 1 ¶ 47. Plaintiff contends he "had not provided an envelope to return the $100.00 money order, and the envelope submitted by . . . Bradshaw, is an envelope used exclusively by staff members and not prisoners." In making this statement, plaintiff cites to an envelope. Doc. Ent. 1 ¶ 48; Doc. Ent. 1-2 at 11 (postmarked July 17, 2007); Doc. Ent. 17 at 28 (postmarked September 5, 2007). Plaintiff contends that "Bradshaw's intent was to have it believed that petitioner had attempted to return a $100.00 money order, when in fact he had not, and the same returned as undeliverable, to buttress the major misconduct report she issued against [him]." Doc. Ent. 1 ¶ 49. Plaintiff

19

further contends that "[t]he facts of . . . Bradshaw's misconduct report had been taken exclusively from the grievance petitioner had filed to recover the money orders taken from him by . . . O'Dell and Abood." Doc. Ent. 1 ¶ 50.

**b.**      Defendants argue that "[t]he money orders were sent in violation of prison policy, and there exist[] adequate state-law remedies for property deprivations." Doc. Ent. 16 at 3. Defendants argue that they "did not violate the plaintiff's due process, and he has adequate state-law remedies." Doc. Ent. 16 at 10-11. According to defendants, "[t]he procedures made available to the plaintiff by the State of Michigan to redress alleged violations of due process with regard to personal property complaints are both available and adequate." Doc. Ent. 16 at 10.

It is defendants' position that "[b]ecause the plaintiff has adequate State remedies available to him, and because he has failed to resort to the other procedures available in Michigan, he cannot establish a deprivation of property without due process of law." Defendants also argue that plaintiff was not deprived of property in the first place, because "he was [not] entitled to possess the money orders, as they were sent in violation of prison rules prohibiting transfer of funds between prisoners." Doc. Ent. 16 at 11.

**c.**      Plaintiff responds that he does not have an adequate state remedy. Doc. Ent. 17 at 2, 4-10. First, he claims that Abood intentionally deprived him of his $150 money order, when she "specifically informed the Informal Administrative Hearing Officer, Defendant O'Dell, the $150 money order was to be placed in the [PBF], when the hearing occurred." Doc. Ent. 17 at 4-5. Plaintiff contends that Abood's predeprivation decision "insults any sense of due process." Plaintiff claims this statement is buttressed by the fact that O'Dell "recognized from plaintiff's

20

proffered evidence he had identified the source of the $150 money order–his wife; and allowed plaintiff to return it." Plaintiff claims there was no "fair" and "impartial" hearing in his case. Plaintiff claims that Abood's August 8, 2007 predeprivation decision was relayed to O'Dell, informing O'Dell that "the money order had to be placed in the PBF." Plaintiff claims that "[w]hen the [August 20, 2007] hearing was held, absent any evidence from plaintiff, the $150 money order was taken and placed in the PBF." Doc. Ent. 17 at 5. Perhaps citing MDOC PD 04.02.105, plaintiff contends that "the policy only permits the property to be taken and placed in the PBF where there has been a finding of sufficient evidence to do so. Obviously, this would entail giving plaintiff the opportunity to place his evidence before the hearing officer. This was not permitted." Consequently, he contends, the hearing was "no more than *pro forma*, a hollow gesture." Plaintiff also contends that an administrative hearing officer "must abide by his prior decision[.]" As plaintiff points out, "the sender of the $150 money order had been identified at the first hearing and it was concluded it should be returned to the source–plaintiff's wife, Rose Gavin." In response to ¶ 7 of Abood's affidavit, plaintiff claims he "has never claimed the P.O. Box was his wife's[.]" Plaintiff alleges that he "has absolutely no knowledge who Theresa Fowler or Roger Lee Wade is." Doc. Ent. 17 at 6. Apparently citing the prohibition of "[f]unds known to be from a family member of another prisoner, parolee or probationer unless the individual sending the funds is a family member of the prisoner receiving the funds[,]" MDOC PD 04.02.105 ¶ J(3), and noting that someone identified as another prisoner's mother used the P.O. Box, plaintiff suggests that ¶ J(3) "ought to have been the reason for the deprivation of the property." Doc. Ent. 17 at 6-7. Furthermore, plaintiff complains, Abood's affidavit "sheds no light on who generated the money order." On the other hand, plaintiff states that it came from

21

his wife.  In response to defendants' claim that the money orders "were sent in violation of

prison rules prohibiting transfer of funds between prisoners[,]" Doc. Ent. 16 at 11, plaintiff

claims there "was no charge of transferring of funds between prisoners."  Instead, plaintiff points

out, the August 8, 2007 notice of package/mail rejection claims the funds were from an

unidentified source.  Doc. Ent. 17 at 7; Doc. Ent. 1-2 at 2.

Second, plaintiff addresses the $100 money order his wife sent to JMF.  Plaintiff claims

that Abood's September 4, 2007 predeprivation decision (to place the $100 money order into the

PBF) stood. Doc. Ent. 17 at 7.  Plaintiff points out that it has not been alleged "the money was

sent by another prisoner's immediate family member," nor has it been alleged "the money had

been sent for having pressured another prisoner to do so."  Doc. Ent. 17 at 7-8. Plaintiff claims

that defendants confiscated the $100 money order in the absence of evidence.  Plaintiff claims

this decision "was driven by the atmosphere Warden Ocweija created to cause additional

hardship upon prisoners, in particular, herein plaintiff."  Plaintiff discredits Abood's affidavit as

irrelevant, claiming that there is no policy that forbids plaintiff from giving money to someone to

purchase something and give the item to someone else.  In plaintiff's opinion, it is clear that the

item purchased is from the provider of the money.  As for Abood's use of the word, "forge,"

plaintiff is not aware that anyone has been charged with forgery.  Doc. Ent. 17 at 8.  In his

affidavit, plaintiff explains that "[t]he alleged numerical sequential of the money orders had

absolutely nothing to do with [plaintiff's] money order not being generated by [his] wife, Rose

Gavin[,]" and "[i]t was not uncommon for [his] wife, Rose Gavin, to provide the money for

someone to purchase and forward a money order in her name so that [plaintiff] may know where

it originated."  Doc. Ent. 17 at 17 ¶¶ 6-7.

22

Plaintiff contends that Abood, O'Dell and Bradshaw acted in concert.  For example, plaintiff claims that "Bradshaw informed Abood to watch for certain . . . money orders; when plaintiff's money orders arrived, Abood informed O'Dell what the outcome of the hearing must be."  Doc. Ent. 17 at 8.  He also claims that as a result of the aforementioned predeprivation decisions, the informal administrative hearings "only mimicked the already made decisions without allowing plaintiff to know of the evidence it had been made upon."  Doc. Ent. 17 at 8-9.  Plaintiff suggests his hearings were not meaningful, because the hearings were "purposefully designed to promote one conclusion and one conclusion only."  Referring to grievance JMF-01474, plaintiff contends he complained "he had not been apprised of any of the evidence used to take his $100 money order[.]" Doc. Ent. 17 at 9.  Yet, Richard Cady's Step I response stated, "the overwhelming evidence here in this specific instance clearly shows that the reporting staff member and the hearing officer made the appropriate determinations in this matter."  Doc. Ent. 17 at 22.  Plaintiff contends that "a grievance is not the forum in which to hold an informal administrative hearing."  Plaintiff contends his state remedies are not adequate, because they do not provide for punitive damages.  Also, he claims, "[d]efendants' actions and behavior were wanton, callous, malicious, and designed for the purpose to make plaintiff's confinement at JMF more miserable th[a]n penological reasons demand."  It is plaintiff's position that defendants hoped their behavior "would force plaintiff to request transfer to another facility.  Plaintiff is a *Hadix*[9] chronic care prisoner.  Under the terms of the injunction therein, [plaintiff] could not be transferred from JMF absent his request."  Doc. Ent. 17 at 9.  Defendants intentional, whimsical, and capricious actions and behavior, plaintiff claims, were not penologically justified and were

---

[9]Plaintiff is likely referring to Case No. 4:92-CV-00110-RJJ, *Hadix, et al. v. Caruso, et al.*

23

"only designed to have plaintiff give up his interest in his health concerns by attempting to force him to request transfer from [JMF]." He claims that "[t]he state affords no adequate remedy to redress the mean spirited and vicious behavior which are clearly violative of well established constitutional rights." Doc. Ent. 17 at 10.

**d.     Procedural Due Process.** The Fourteenth Amendment does not protect against all of the State's deprivations of life, liberty, or property. *Parratt v. Taylor*, 451 U.S. 527, 537 (1981). It protects against only those deprivations of life, liberty, or property that are "without due process of law." *Id.* Accordingly, the Supreme Court has recognized that the negligent deprivation of an inmate's property does not violate due process if the state provides an adequate remedy to redress the wrong. *Parratt*, 451 U.S. at 537, overruled in part by *Daniels v. Williams*, 474 U.S. 327, 328 (1986) (negligence does not amount to a "deprivation" at all, thus the Due Process Clause is not implicated). Likewise, "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." *Hudson v. Palmer*, 468 U.S. 517, 533 (1984).[10] In asserting a violation of procedural due process, a plaintiff must plead and prove that available state procedures for redressing the wrong are not adequate. *Vicory v. Walton*, 721 F.2d 1062, 1065-66 (6th Cir. 1983); *see also, Wilson v. Beebe*, 770 F.2d 578, 584 (6th Cir. 1985) (en banc). "Although the state remedies may not provide the respondent with all the relief which may have been available if he could have

---

[10]*See also McGinnis v. Woods*, No. 87-2080, 1988 WL 23713, 1 (6th Cir. Mar. 16, 1988) ("Plaintiff[']s claim that he was wrongfully deprived of his state-created property interest in his prison laundry job is also without merit because plaintiff failed to plead and prove the inadequacy of state remedial procedures for the alleged random and unauthorized deprivation.") (referencing *Hudson*, 468 U.S. at 531-533, and *Joyce v. Mavromatis*, 783 F.2d 56, 57 (6th Cir. 1986)).

proceeded under § 1983, that does not mean that the state remedies are not adequate to satisfy

the requirements of due process." *Parratt*, 451 U.S. at 544.

As will be discussed in the next section, there are many instances in which plaintiff's

Fourteenth Amendment claim is alleged to be based upon his "substantive due process" rights.

However, plaintiff's response does mention "predeprivation decisions," Doc. Ent. 17 at 5, 8-9,

and the adequacy of his remedies, Doc. Ent. 17 at 2, 9-10.  For example, plaintiff claims that

"[t]he state court remedies are inadequate because they merely require the return of the

wrongful[ly] taken property and do[] not provide a general remedy for recovery of damages in

compensation or penalty for breach of any statute or common-law."  Doc. Ent. 1 ¶¶ 71.

Therefore, this report and recommendation applies the analysis set forth in *Parratt*,

wherein the Supreme Court stated:

> The justifications which we have found sufficient to uphold takings of property
> without any predeprivation process are applicable to a situation such as the
> present one involving a tortious loss of a prisoner's property as a result of a
> random and unauthorized act by a state employee. In such a case, the loss is not a
> result of some established state procedure and the State cannot predict precisely
> when the loss will occur. It is difficult to conceive of how the State could provide
> a meaningful hearing before the deprivation takes place. The loss of property,
> although attributable to the State as action under "color of law," is in almost all
> cases beyond the control of the State. Indeed, in most cases it is not only
> impracticable, but impossible, to provide a meaningful hearing before the
> deprivation. That does not mean, of course, that the State can take property
> without providing a meaningful postdeprivation hearing. The prior cases which
> have excused the prior-hearing requirement have rested in part on the availability
> of some meaningful opportunity subsequent to the initial taking for a
> determination of rights and liabilities.

*Parratt*, 451 U.S. at 541.[11]

_____

[11]In *Daniels v. Williams*, 474 U.S. 327 (1986), the Supreme Court reconsidered its statement
in *Parratt* that "'the alleged loss, even though negligently caused, amounted to a deprivation.'"
*Daniels*, 474 U.S. at 328 (citing *Parratt*, 451 U.S. at 536-537).  The Court held that "the Due

The Court need not address defendants' argument that "plaintiff did not suffer a deprivation of property because he was not entitled to possess the money orders that were sent in violation of prison rules."  This is so, because defendants are correct that "even if there was a deprivation, [plaintiff's] due-process rights were not offende[d][,] [as] he received a hearing and . . . adequate state-law remedies exist."  Doc. Ent. 16 at 16.

To the extent plaintiff alleges that defendants did not comply with MDOC PD 04.02.105, "[t]he state simply has no 'federal due process obligation to follow all of its procedures; such a system would result in the constitutionalizing of every state rule, and would not be administrable.'"  *Jackson v. Hamlin*, 61 Fed.Appx. 131, 132 (6th Cir. 2003) (quoting *Levine v. Torvik*, 986 F.2d 1506, 1515 (6th Cir.1993)[12]).

To the extent that plaintiff alleges that he was deprived of his property by prison officials, Michigan's three-step grievance system provides state prisoners with an adequate procedure to challenge actions taken by prison officials.  An inmate may file a written grievance (Step I); if its resolution by the grievance coordinator is unsatisfactory to plaintiff, he may then seek sequential evaluation of its disposition by supervisory staff, such as the warden or designated deputy warden (Step II) and the Grievance and Appeals Section on the MDOC Director's behalf (Step III).  *See* MDOC PD 03.02.130 ("Prisoner/Parolee Grievances"), effective 07/09/07, ¶¶ V-GG.[13]

---

Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property."  *Daniels v. Williams*, 474 U.S. 327, 328 (1986).

[12]*Levine* was overruled on other grounds by *Thompson v. Keohane*, 516 U.S. 99 (1995).

[13]Defendants point out that "the plaintiff not only used the grievance procedure, but claims that the grievance respondent attempted to correct the alleged procedural defects in his rejection hearing."  Doc. Ent. 16 at 11.

Furthermore, if these levels prove insufficient,[14] Michigan law allows for judicial review of administrative decisions in the state courts.  *DeWalt v. Warden, Marquette Prison*, 112 Mich. App. 313, 315 N.W.2d 584, 585 (1982); *see* Mich. Comp. Laws §§ 791.251 et seq.  Additionally, Michigan's state remedies have been held to be adequate under federal due process standards. *Copeland v. Machulis*, 57 F.3d 476, 480 (6th Cir. 1995); *Branham v. Spurgis*, 720 F. Supp. 605, 608 (W.D. Mich. 1989).  "[R]edress for most prisoner actions, including alleged constitutional violations, is available under the extensive process provided by Michigan state law. Michigan provides several adequate post-deprivation remedies, including Michigan Court Rule 3.105 that allows an action for claim and deliver, Mich. Comp. Laws § 600.2920 that provides for a civil action to recover possession of or damages for goods and chattels unlawfully taken or detained, and Mich. Comp. Laws § 600.6401, the Michigan Court of Claims Act, which establishes a procedure to compensate for alleged unjustifiable acts of state officials." *Copeland v. Machulis*, 57 F.3d 476, 480 (6th Cir. 1995).  "Furthermore, as a state agency subject to the Michigan Administrative Procedures Act, Mich. Comp. Laws §§ 24.201-.403, the Department of Corrections is subject to numerous state laws relating to prisoner grievances.  Mich. Comp. Laws §§ 791.251-.255. . . . The Sixth Circuit has squarely held that the appeal of administrative decisions to the state circuit court provides an adequate remedy for violations of due process for purposes of *Parratt v. Taylor*." *Copeland*, 57 F.3d at 480.  Also, plaintiff may seek

---

[14]In his August 22, 2007 Step I grievance (JMF-01329), plaintiff disputes the characterization of the sender of the $150 money order as "unidentified."  He contends that the sender of the July 13, 2007 rejected mail was his wife.  As for the August 8, 2007 return, plaintiff claimed, "[t]he source of the returned money order is myself through inadvertently placing the Grand rapids address on the envelope."  Doc. Ent. 1-2 at 6.

reimbursement for property loss under MDOC PD 04.02.110 ("Prisoner Benefit Fund")[15] or

MDOC PD 04.02.112 ("Prisoner Personal Property").[16]

Furthermore, as defendants note, plaintiff could bring a state action for conversion of

personal property. Doc. Ent. 16 at 11. *See Lawrence v. Department of Corrections*, 81

Mich.App. 234, 240, 265 N.W.2d 104, 107 (1978) ("Plaintiff is charging that prison employees

stole his property. Such conversion is an intentional tort. The commission of an intentional tort

is not a governmental function.").

In short, "plaintiff has not shown that no adequate postdeprivation state remedy was

available," and therefore he has not alleged a violation of his procedural due process rights so as

to enable him to state a § 1983 claim. *Barnier v. Szentmiklosi*, 810 F.2d 594, 600 (6th Cir.

1987).

**e.    Substantive Due Process.** In several places, plaintiff's complaint refers to his

*substantive* due process rights. Doc. Ent. 1 ¶¶ 21, 22, 32, 33, 41, 54, 59, 66 (Doc. Ent. 1 at 23 ¶

E). For example, plaintiff contends that O'Dell accepted Abood's conclusionary statement

without plaintiff's "knowledge or comment on the evidence[.]" Doc. Ent. 1 at 11-12 ¶ 21.

Plaintiff also claims that the administrative hearing report does not mention "why the missing

---

[15]"A PBF shall be used to fund only those services, equipment, and supplies that provide a direct benefit to the prisoner population and are solely for prisoner use or which are contributions to charitable organizations approved by the Warden or designee. The PBF shall not be used to fund an activity or program that is necessary to institutional operations. Expenditures may include, but are not limited to . . . [p]risoner compensation for verified property losses where the prisoner was not negligent[.]" MDOC PD 04.02.110, effective 07/21/2008, ¶ H3.

[16]"If the prisoner incurs a loss through no fault of his/her own, s/he may petition the institution's Prisoner Benefit Fund, as provided in PD 04.02.110 "Prisoner Benefit Fund", or request reimbursement through the State Administrative Board, in accordance with OP 03.02.130-A "State Administrative Board Prisoner Property Reimbursement"." MDOC PD 04.07.112, ¶ B.

evidence had not been produced at [his] administrative hearing[.]" Doc. Ent. 1 at 12 ¶ 22.  Also, plaintiff contends that each of the defendants has "intentionally a[n]d maliciously violated [his] Fourteenth Amendment to the United States Constitution, right to substantive due process of law."  Doc. Ent. 1 at 21 ¶ 66.

"The test for substantive due process claims is whether defendants' conduct 'shocks the conscience.'" *Cale v. Johnson*, 861 F.2d 943, 949 (6th Cir. 1988)[17] (citing *Rochin v. California*, 342 U.S. 165 (1952)).  "[A]n 'egregious abuse of governmental power' may be sufficient to state a claim based on the violation of substantive due process."  *Cale*, 861 F.2d at 949 (citing *Vinson v. Campbell County Fiscal Ct.*, 820 F.2d 194, 201 (6th Cir.1987)).

In *Cale*, plaintiff had alleged a "conspiracy to violate procedural and substantive due process and cruel and unusual punishment."  *Cale*, 861 F.2d at 945.  On appeal from the district court's grant of summary judgment for two of the defendants, the Sixth Circuit agreed that "the district court erred [when it held] that appellee Wahl's abuse of his authority as a prison official to plant illegal drugs on appellant, a prison inmate, for retaliatory purposes did not violate appellant's substantive due process rights."  *Cale*, 861 F.2d at 948.  The Court considered its decision in *Vinson*, noting that "[t]he probation officer's alleged unlawful, malicious, and intentional deprivation of the mother's liberty interest in custody of her children was an egregious abuse of governmental power sufficient to state a claim based on substantive due

---

[17]Eleven years later, *Cale* was overruled on other grounds by *Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999), wherein the Sixth Circuit stated, "[t]o the extent that our prior decisions have imposed the 'shocks the conscience' test when prisoners claim retaliation in violation of an enumerated constitutional right, they are in conflict with the Supreme Court's decisions in *Graham [v. Connor*, 490 U.S. 386 (1989)] and its progeny and are no longer the law of this Circuit." *Thaddeus-X*, 175 F.3d at 388 (referencing *Cale*, 861 F.2d at 945).

process." *Id.* at 949.  The Sixth Circuit concluded that "the evidence supports a claim that Wahl intentionally and maliciously framed Cale and filed disciplinary charges against him in retaliation for Cale's exercise of his first amendment rights.  This alleged conduct constitutes an egregious abuse of authority within the meaning of *Vinson*." *Id*. at 950.  The Sixth Circuit further noted that "[a]ppellant alleges that in retaliation for appellant's complaint about the food a federal prison official framed him by instructing another inmate to plant narcotics on him and by then filing false disciplinary charges. Appellant was subject to the possibility of disciplinary sanctions and a resulting loss of liberty as a consequence of the alleged actions." *Id*. at 950-951.

**f.**     It appears that plaintiff's substantive due process claim, as described in his complaint, is based upon his assertion that there was "substance," such as evidence or his testimony, missing from his administrative hearings on the notices of package/mail rejection.  Additional insight comes from plaintiff's Step III grievance appeal in JMF-01329, wherein he states that plaintiff was denied substantive due process as a result of Abood dictating to O'Dell "what the outcome of the hearing must be."  Doc. Ent. 1-2 at 9.

I note that both the August 20, 2007 and September 20, 2007 administrative hearing reports contain a prisoner statement.  Doc. Ent. 1-2 at 3, 15.  I also note that amended hearing reports were requested in response to plaintiff's grievances.  For example, plaintiff's August 22, 2007 grievance (JMF-01329) noted that O'Dell "neglected to complete the [August 20, 2007] report through failure to reach a disposition."  Doc. Ent. 1-2 at 6.  Stanton's September 7, 2007 Step I grievance response requested the completion of an amended administrative hearing report (Doc. Ent. 1-2 at 7).  Ocwieja's October 1, 2007 Step II response to plaintiff's September 16, 2007 Step II grievance, which apparently noted that evidence was not present at the hearing,

requested that O'Dell complete an amended hearing report (Doc. Ent. 1-2 at 8). In another example, Ocwieja's October 22, 2007 Step II response to plaintiff's September 26, 2007 grievance (JMF-01474) states that "O'Dell will issue an amended hearing report which indicates the reason for the absence of the item at the [September 20, 2007] hearing in accordance with Ms. VanOchten's memorandum dated July 3, 2007." Doc. Ent. 1-2 at 20. In any event, the Court should conclude that neither of these instances constitutes behavior which "shocks the conscience."

It is not clear whether plaintiff intended to bring a substantive due process claim against Bradshaw. Perhaps plaintiff takes issue with the veracity of the bases for Bradshaw's misconduct ticket. For example, in his response brief, plaintiff points to Bradshaw's November 1, 2007 responses to plaintiff's October 30, 2007 questions. Doc. Ent. 17 at 10; Doc. Ent. 17 at 29-31. With respect to Bradshaw's assertion that plaintiff requested a money order be sent to Rose Gavin at 412 Lewis, Caro, MI (Doc. Ent. 17 at 31), plaintiff claims that the letter postmarked September 5, 2007 and sent to Caro, Michigan was in an envelope "not the kind used by prisoners." Doc. Ent. 17 at 10; Doc. Ent. 17 at 28. Plaintiff claims he did not make any attempt "to have the rejected $100 money order sent anywhere because the decision had already been made to place it in the PBF prior to the hearing." Doc. Ent. 17 at 10-11. According to plaintiff, he did not attempt "to return a rejected money order to a Caro, Michigan address, and the attached envelope is the one Defendant Bradshaw wished the disciplinary hearing officer to believe [he] had made out the envelope for mailing; her attempt to conclude I lied within the grievance." Doc. Ent. 17 at 16 ¶ 3.

31

Even if plaintiff's substantive due process claim is based upon the fact that Bradshaw wrote him a misconduct ticket for "[i]nterference with administration of rules," which resulted in a finding that "the reporter failed to allege the elements of this offense[,]" Doc. Ent. 1-2 at 24, the Sixth Circuit has stated that "a prisoner has no constitutional right to be free from false accusations of misconduct." *Jackson v. Hamlin*, 61 Fed.Appx. 131, 132 (6th Cir. 2003) (referencing *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir.1986) ("The prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest.")).

For these reasons, the Court should conclude that plaintiff's substantive due process claims do not survive summary judgment.

**3.    Defendants are not entitled to summary judgment on plaintiff's First Amendment claim against Bradshaw.**

**a.**    This report interprets plaintiff's First Amendment claim as brought solely against Bradshaw.  With respect to the October 24, 2007 major misconduct ticket, plaintiff contends that it was Bradshaw's intent "to have it believed that [he] had attempted to return a $100.00 money order, when in fact he had not, and the same returned as undeliverable, to buttress the major misconduct report she issued against petitioner."  Doc. Ent. 1 at 17 ¶ 49.  Plaintiff claims that "[t]he facts of . . . Bradshaw's misconduct report had been taken exclusively from the grievance petitioner had filed to recover the money orders taken from him by . . . O'Dell and Abood."  Doc. Ent. 1 ¶ 50.

It is plaintiff's position that "to use the facts of a filed grievance is a violation of disciplinary charging [under MDOC PD 03.03.105 ("Prisoner Discipline")[18]] and [a] violation of [his] First Amendment right."  Doc. Ent. 1 at 18 ¶ 51.  Plaintiff claims the allegation made in his grievance was not false and did not cause a staff member or prisoner to be disciplined.  Doc. Ent. 1 at 18 ¶ 52.  According to plaintiff, "Bradshaw had been motivated in substantial part by a desire to punish [him] for exercising his rights, i.e., requesting an administrative hearing challenging the rejections of the money order and filing of a grievance."  Doc. Ent. 1 at 18 ¶ 53. Even though the major misconduct charge was ultimately dismissed, plaintiff contends that "Bradshaw had achieved her purpose to intimidate, harass, humiliate, and cause undue hardship, through her unconstitutional conduct for having filed his grievance to recover his two wrongfully confiscated money orders."  Doc. Ent. 1 at 18-19 ¶ 56.  Plaintiff claims Bradshaw's behavior was intentional and was specifically intended to and did violate MDOC PD 01.04.110 ("Administrative Rules, Policies, and Procedures") and his First Amendment right to petition the government.  Doc. Ent. 1 at 19 ¶ 57.

---

[18]The major rule violation of "Interference with the Administration of Rules" is defined as "Acts intending to impede, disrupt, or mislead the disciplinary process for staff or prisoners, including failure to comply with a loss of privileges sanction imposed by a hearing officer."  The policy provides the following common examples:  "Intimidating or tampering with a witness; tampering with evidence; interfering with an employee writing a misconduct report; making false accusations of misconduct against another prisoner or staff which results in disciplinary action being initiated against the person. (NOTE:  Should not be charged as retaliation for the writing of a grievance; if written as result of a grievance, it must be shown that prisoner knew allegation was false when s/he made it and intentionally filed a false grievance.  Ordinarily, the statement of staff member refuting the claim will not be sufficient.)[.]"  MDOC PD 03.03.105B, effective 02/01/09. *See also* Doc. Ent. 1 ¶ 44.

Plaintiff cites the "General Information" paragraph of MDOC PD 01.04.110.[19]  Doc. Ent. 1 ¶ 58.  He claims that "[c]oncomitant with violation[s] of MDOC policy directives . . . each [defendant] violated [his] constitutional right to be free from cruel and unusual punishment, harassment, intimidation, and substantive due process of law."  Doc. Ent. 1 at ¶ 59.

**b.**     Defendants argue that "[t]he misconduct was written before the hearings and before the grievances were written.  In addition, the misconduct would have been written even in the absence of the plaintiff's grievances and hearings."  Doc. Ent. 16 at 3.  Defendants' argument that they "did not violate the plaintiff's First Amendment rights[,]" is based upon an alleged absence of protected conduct and causation.  Doc. Ent. 16 at 12-13.

In response to ¶ 53 of the complaint, defendants assert that Bradshaw wrote the ticket "due to the plaintiff's non-protected conduct involving violating prison rules" and "would have written the ticket even if the plaintiff had not written the grievance[,]" as "the date of the ticket corresponds with the date of a letter intercepted by Bradshaw regarding the plaintiff's activities."  Doc. Ent. 16 at 12-13.  As to plaintiff's claim that the misconduct ticket was written as a result of plaintiff's grievances, defendants argue that "causation is lacking because the grievances were written after the ticket[,]" and "the misconduct hearings . . . occurred after the ticket was written."  Doc. Ent. 16 at 13.  Defendants also assert that "[t]o the extent [plaintiff] alleges that the misconduct was written as a result of his requesting mail-rejection hearings, he fails to allege

_____

[19]"All employees are to be informed of Department policies as well as necessary procedures to carry out these policies.  Non-compliance with Department policy may leave the Department liable and employees vulnerable to prosecution and civil suit, as well as disciplinary action. Failure to follow policy may also result in an employee not being represented by the Department of Attorney General or not being indemnified by the Department if a monetary judgment is obtained against the employee as set forth in PD 02.01.102 "Litigation - Department and Employee Responsibilities"."  MDOC PD 01.04.110, effective July 1, 2007, ¶ A.

any connection between the hearings and the misconduct.  He makes only an unsupported, conclusory allegation and fails to link Bradshaw in any way to the hearings."  Doc. Ent. 16 at 16.

**c.**      In response, plaintiff asserts that "defendants intentionally or inadvertently have distorted the facts of the retaliation claim, [as] they have alleged the [October 24, 2007] misconduct report had been issued prior to the filing of his grievance [filed on August 22, 2007 and September 26, 2007] [when], in fact, the major misconduct report occurred after the filing of his grievance."  Doc. Ent. 17 at 2.

Plaintiff notes the October 24, 2007 major misconduct report was written only one day after Ocwieja's October 22, 2007 Step II grievance appeal response in JMF-01474.  Doc. Ent. 17 at 11; Doc. Ent. 17 at 18.

It is plaintiff's position that there is little doubt "Bradshaw would not have written the misconduct absent [plaintiff's] filing of the grievance."  According to plaintiff, Bradshaw's statement(s) in the misconduct report that plaintiff lied to JMF staff "formed the basis of the misconduct report."  Doc. Ent. 17 at 11.[20]  Citing Bradshaw's November 1, 2007 response that "[i]nterviews in any disciplinary matter have no bearing on the hearing of this misconduct report[,]" plaintiff claims that "[t]he sole place . . . Bradshaw could have retrieved the information of plaintiff's wife['s] address was from the grievance.  Therefore, absent the grievance . . . Bradshaw would not have issued the major misconduct report."  Doc. Ent. 17 at 12; Doc. Ent. 17 at 31.

---

[20]As previously noted, plaintiff states he did not attempt "to return a rejected money order to a Caro, Michigan address, and the attached envelope is the one Defendant Bradshaw wished the disciplinary hearing officer to believe [he] had made out the envelope for mailing; her attempt to conclude I lied within the grievance."  Doc. Ent. 17 at 16 ¶ 3.

**d.**      "A retaliation claim essentially entails three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two-that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.  *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).

Plaintiff claims he has met the test for a First Amendment retaliation claim as set forth in *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).  Doc. Ent. 17 at 12.  Citing *Connick v. Meyers*, 461 U.S. 138, 147 (1983), plaintiff claims he has a First Amendment right to file administrative grievances and lawsuits concerning the conditions of his confinement.  Doc. Ent. 17 at 14.

Plaintiff's First Amendment retaliation claim survives summary judgment.  First, plaintiff has engaged in protected conduct.  Plaintiff contends he has a Fourteenth Amendment substantive due process right to request an administrative hearing in regard to his property - the $150 and $100.00 money orders.  Doc. Ent. 1 at 18 ¶ 54.  He further contends that "[t]o file a grievance to agrieve an erroneous administrative decision, to forfeit [his] $150.00 and $100.00 money orders, is protected by the First Amendment."  Doc. Ent. 1 at 18 ¶ 55.

Plaintiff has a First Amendment right to file non-frivolous administrative grievances. The Sixth Circuit has stated that "[a]n inmate has an undisputed First Amendment right to file grievances against prison officials on his own behalf."  *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000).  *See also Jordan v. Dennis*, No. 05-cv-74362, 2006 WL 3446230, 4 (E.D. Mich. Nov. 27, 2006) ("While an inmate has an undisputed First Amendment right to file grievances

36

and lawsuits against prison officials on his own behalf, *Noble v. Schmitt*, 87 F.3d 157, 162 (6th

Cir.1996), this right is protected only if the grievances or lawsuits are not frivolous. *Lewis v.

Casey*, 518 U.S. 343, 353[] (1996)[.]") (Hood, J., accepting report and recommendation of

Scheer, M.J.).  This report assumes, *arguendo*, that plaintiff had a right to request an

administrative hearing with respect to the rejected mail.  *See Desmone v. Adams*, No. 97-1275,

1998 WL 702342, 2 (6th Cir. Sept. 23, 1998) ("Desmone next argues that the defendants violated

his procedural due process rights by not affording him a hearing before denying him the mail.

Desmone was provided with notice and a hearing, and therefore all the requirements of

procedural due process were met, thus rendering his claim meritless.").

Second, the issuance of the October 24, 2007 major misconduct ticket constitutes an

adverse action.  "[P]risoners who are subject to a major misconduct charge are generally

transferred to administrative segregation, and that this court has concluded that placing a

prisoner in administrative segregation is an adverse action."  *Brown v. Crowley*, 312 F.3d 782,

789 (6th Cir. 2002) (citing *Herron*, 203 F.3d at 416, and *Thaddeus-X*, 175 F.3d at 396).

Furthermore, even if a plaintiff was already in administrative segregation[21] and was ultimately

found not guilty of the major misconduct, "the issuance of the major misconduct charge

subjected [plaintiff] to the risk of significant sanctions."  *Brown*, 312 F.3d at 789 (citing Mich.

Admin. Code R. 791.5505(1)).  *But see Jackson v. Hamlin*, 61 Fed.Appx. 131, 133 (6th Cir.

2003) ("Jackson did not suffer an adverse action that would have deterred a person of ordinary

firmness from filing further complaints because Jackson's misconduct conviction was overturned

on appeal and no sanctions were imposed.").

---

[21]Plaintiff was on bond pending his hearing.  Doc. Ent. 1-2 at 23.

37

Third, there is a genuine issue of material fact as to causation.  Defendants' assertions that "the grievances were written after the ticket[,]" Doc. Ent. 16 at 13, and "[t]he misconduct ticket could not have been written due to [plaintiff's] grievances or hearings because [plaintiff's] grievances and the hearings occurred after the misconduct charge[,]" Doc. Ent. 16 at 16, are simply not true.  Plaintiff's notices of package/mail rejection are dated August 8, 2007 and September 4, 2007; the related administrative hearings occurred on August 20, 2007 and September 12 or 20, 2007; and the Step I grievances are dated August 22, 2007 and September 26, 2007.  To be sure, the misconduct ticket's "Violation Date" is August 14, 2007, the date of the correspondence which allegedly formed the basis of the misconduct ticket; *however, Bradshaw wrote the ticket on October 24, 2007*.  Doc. Ent. 1-2 at 23.

Furthermore, defendants' assertions that "Bradshaw would have written the ticket even if the plaintiff had not written the grievances[,]" Doc. Ent. 16 at 13, and "the misconduct would have been written even in the absence of the grievances and hearings[,]" Doc. Ent. 16 at 16, are questionable.  The date of the ticket, October 24, 2007, does not correspond with the date of the letter, August 14, 2007, which formed the basis of the ticket.  However, the material question of fact on causation is not just established by the fact that the adverse action followed the alleged protected conduct.  Here, Bradshaw's affidavit (Doc. Ent. 16-4) does not explain the temporal disparity of the date the ticket was written and the date of the conduct on which the ticket was based.  Also, Abood represents that "[o]n August 15, 2007, [she] received an email from inspector Bradshaw asking staff to be on the lookout for the following money orders: Gavin - $100, Washington - $100, Durr - $250, Gross - $180, and Rogers - $180."  Doc. Ent. 16-3 ¶ 11.

This would contradict an argument that, for example, Bradshaw did not know about the August 14, 2007 letter until the issuance of Ocwieja's October 22, 2007 Step II response.

One more note about causation. Among the allegations in Bradshaw's major misconduct report is the assertion that "Prisoner Gavin has filed grievances in an attempt to have the money order placed in his account or sent to the PO box of 453 Twin Lake, MI which is the PO box of Theresa Fowler. Prisoner Gavin is well aware of his wife's address as well as the fact that the money order did not originate from his wife." Doc. Ent. 1-2 at 23. Plaintiff alleges that the allegations in his grievance were not false, Doc. Ent. 1 ¶¶ 45, 52, apparently suggesting that the major misconduct charge of "Interference with Administration of Rules" was improper. Although the misconduct ticket does not specify the rule with which it believes plaintiff interfered, it seems that the misconduct ticket may have been written for interference with the administration of MDOC PD 04.02.105 ("Prisoner Funds") or MDOC PD 05.03.118 ("Prisoner Mail") or, as plaintiff suggests, an interference with MDOC PD 03.02.130 ("Prisoner/Parolee Grievances"). Whatever the alleged, underlying interference, my conclusion regarding causation stands.

**4.      Defendants are entitled to summary judgment on plaintiff's Eighth Amendment claims.**

**a.**      With respect to the August 8, 2007 notice of package/mail rejection, plaintiff alleges that defendants O'Dell, Abood and Bradshaw's "behavior was intentional to intimidate, harass, humiliate, and caused [plaintiff] undue hardship all in violation of the Eighth Amendment prohibition against cruel and unusual punishment." Doc. Ent. 1 at 14 ¶ 34. With respect to the September 4, 2007 notice of package/mail rejection, plaintiff alleges that defendants O'Dell, Abood and Bradshaw's "behavior was intentional to intimidate, harass, humiliate, and caused

petitioner undue hardship all in violation of the Eighth Amendment prohibition against cruel and unusual punishment." Doc. Ent. 1 at 15 ¶ 42. Furthermore, plaintiff contends that each of the defendants "acting separately or in combination, have cause[d] [plaintiff] cruel and unusual punishment prohibited by the Eighth Amendment to the United States Constitution." Doc. Ent. 1 ¶ 67. *See also* Doc. Ent. 1 ¶ 59 (alleging that each defendant violated his right against cruel and unusual punishment).

Defendants argue that plaintiff "does not allege that any force was used against him or that he was denied medical care or any other necessities." Doc. Ent. 16 at 3. Defendants argue that they "did not violate the plaintiff's Eighth Amendment rights." Doc. Ent. 16 at 13-14. Specifically, they state that "plaintiff has not alleged that any force has been used against him, nor has he alleged that he has been denied medical care." Doc. Ent. 16 at 14.

In support of his Eighth Amendment claim, plaintiff responds:

> Plaintiff's claim shows a scenario created by acting Warden John Ocweija, implemented upon plaintiff by these defendants. Defendants created an unnecessary hardship through their crystal ball gazing to confiscate his money orders where it caused mental anguish and it rendered plaintiff unable to purchase toiletries and other essentials, stamps, station[e]ry items, for example. Again, there is no penological justification for these deprivations.
> Plaintiff is a *Hadix* chronic care prisoner. The injunction entered by the lawsuit prohibited JMF to transfer this category of prisoners. Simply because plaintiff was concerned for his health, he had to suffer the punishment, narrated at the onset of this reply. Defendants['] actions and behavior were intentional, malicious, and reckless.

Doc. Ent. 17 at 13-14. In his affidavit, plaintiff claims:

> The attorneys of the *Hadix* case had been informed of Warden John Ocweija's actions and behavior at JMF a number of time[s] because of his intent to harass, intimidate, and make confinement at JMF an additional hardship in defiance of the injunction entered in the *Hadix* case.

Doc. Ent. 17 at 16 ¶ 5.

40

**b.**      Having considered the complaint, motion and response, it is not exactly clear on what basis plaintiff brings his Eighth Amendment claim.  For example, plaintiff is not alleging a violation of the Eighth Amendment based upon an excessive use of force, *i.e. Whitley v. Albers*, 475 U.S. 312 (1986).  Nor is he alleging a violation of his Eighth Amendment right against deliberate indifference to a serious medical need, *i.e. Estelle v. Gamble*, 429 U.S. 97 (1976).  Nor is he alleging a failure to act.  *See, i.e.*, *Wilson v. Yaklich*, 148 F.3d 596, 600 (6th Cir. 1998).

At most plaintiff has alleged that defendants intentionally intimidated, harassed and humiliated him, and caused him undue hardship.   Doc. Ent. 1 ¶¶ 34, 42.  However, "a physical injury must be more than de minimis to support a claim for mental or emotional suffering under the Eighth Amendment and § 1997e(e)."  *Robinson v. Corrections Corp. of America*, 14 Fed.Appx. 382, 383 (6th Cir. 2001) (citing cases).  In *Robinson*, plaintiff "alleged that he suffered emotional distress, embarrassment, humiliation, and itching, and requested $700,000 in damages."  *Robinson*, 14 Fed.Appx. at 383.  The Court concluded that "[b]ecause he suffered at most only de minimis physical injury, Robinson had no claim for relief under either the Eighth Amendment or the ADA. Accordingly, his complaint lacked an arguable basis in law."  *Id.*  *See also Hardy v. Vieta*, 174 Fed.Appx. 923, 926 (6th Cir. 2006) ("the record contains evidence that Vieta acted wantonly. Mathieu testified that upon seeing Hardy, Vieta uttered words indicating wantonness and premeditation. Mathieu also testified that after slamming the door on Hardy, Vieta left the cell block laughing."); *Kent v. Johnson*, 821 F.2d 1220, 1227 -1228 (6th Cir. 1987) ("Construing plaintiff's complaint liberally, he alleges that female prison guards have allowed themselves unrestricted views of his naked body in the shower, at close range and for extended periods of time, to retaliate against, punish and harass him for asserting his right to privacy.").

41

5.      **The Eleventh Amendment bars some of plaintiff's claims, and defendants are not entitled to qualified immunity with regard to plaintiff's First Amendment retaliation claim.**

Defendants argue that they "are State employees that acted in their official capacities at all times.  The defendants acted reasonably, and they did not violate the plaintiff's clearly established constitutional rights."  Doc. Ent. 16 at 3.  Defendants argue, they "are entitled to Eleventh Amendment and qualified immunities."  Doc. Ent. 16 at 14-16.

a.      **Plaintiff's 42 U.S.C. § 1983 damages claims against defendants in their official capacities are barred by the Eleventh Amendment.**

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI.  Defendants state that they "are employees of the State of Michigan who acted in their official capacities.  The State of Michigan has not consented to suit,[22] and the defendants enjoy Eleventh Amendment immunity in their official capacities."  Doc Ent. 16 at 14.

_____

[22]"There are . . . three qualified exceptions to Eleventh Amendment immunity[.]" *Lawson v. Shelby County, TN*, 211 F.3d 331, 334 (6th Cir. 2000).  "First, a state may waive the protection of the Amendment by consenting to the suit." *Lawson*, 211 F.3d at 334.  "The second exception to the Eleventh Amendment bar is that Congress, under certain provisions of the Constitution, may abrogate the sovereign immunity of the states through statute." *Id*.  "Under the third exception, a federal court may enjoin a 'state official' from violating federal law." *Id*. at 335 (citing *Ex parte Young*, 209 U.S. 123 (1908)).  This is a limited exception to the Eleventh Amendment bar for suits against state officers in their official capacities which seek only prospective relief.  To come within this exception, the relief sought by the plaintiff must (1) remedy a continuing violation of federal law; and (2) properly be characterized as prospective. *See Verizon Maryland, Inc. v. Public Service Commission of Maryland*, 535 U.S. 635, 645 (2002); *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 73 (1996).

42

The United States Supreme Court has explained that "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989) (citing *Brandon v. Holt*, 469 U.S. 464, 471 (1985)).  *See also*, *Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Kentucky v. Graham*, 473 U.S. 159, 166-67 (1985).  "As such, it is no different from a suit against the State itself." *Will*, 491 U.S. at 71.  "[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983." *Id*.

Defendants argue that they "are employees of the State of Michgian who acted in their official capacities."  They also argue that "[t]he State of Michigan has not consented to suit, and the defendants enjoy Eleventh Amendment immunity in their official capacities."  Doc. Ent. 16 at 14.

Here, the MDOC defendants are state officials, and plaintiff's 42 U.S.C. § 1983 claims against them, to the extent the claims are based upon defendants' official capacities, are barred.  However, plaintiff may sue defendants for damages in their personal capacities, because "state officials, sued in their individual capacities, are 'persons' within the meaning of § 1983.  The Eleventh Amendment does not bar such suits, nor are state officers absolutely immune from personal liability under § 1983 solely by virtue of the 'official' nature of their acts." *Hafer v. Melo*, 502 U.S. 21, 31 (1991).

Plaintiff's complaint does not specify whether defendants are sued in their official or personal capacities.  Doc. Ent. 1 at 4, 7-8.  Plaintiff's prayer for relief includes requests for compensatory and punitive awards, as well as an award of reasonable costs and attorney fees. Doc. Ent. 1 at 22-23 ¶¶ A-G.  Based on the foregoing caselaw, plaintiff's claims for monetary

damages to the extent they are brought against defendants in their official capacities are barred. The Court should only consider the claims against defendants insofar as they are sued in their personal capacities to the extent that plaintiff seeks monetary damages.

**b.     The Court need only address the issue of defendants' entitlement to qualified immunity with respect to the First Amendment retaliation claim.**

The Sixth Circuit has stated that the qualified immunity inquiry requires a three-step analysis: (1) has plaintiff alleged a violation of a constitutional right?; (2) if so, was that right clearly established at the time of the alleged conduct?; and (3) if the right was clearly established, has plaintiff alleged and sufficiently supported that the official actions were objectively unreasonable in light of this clearly established right? *See Dickerson v. McClellan*, 101 F.3d 1151, 1157-58 (6th Cir. 1996).[23]  "Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity." *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006) (citing *Barrett v. Steubenville City Schs.*, 388 F.3d 967, 970 (6th Cir.2004)).

---

[23]*See also Saucier v. Katz*, 533 U.S. 194 (2001), wherein the Supreme Court stated, "A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry." *Saucier*, 533 U.S. at 201 (citing *Siegert v. Gilley*, 500 U.S. 226, 232 (1991)).  "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Saucier*, 533 U.S. at 201.  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. at 202.

Earlier this year, the Supreme Court stated, "[a]lthough we now hold that the *Saucier* protocol should not be regarded as mandatory in all cases, we continue to recognize that *it is often beneficial*." *Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009) (emphasis added).

With respect to qualified immunity, defendants argue that they "did not violate the

plaintiff's constitutional rights[:]

> . . . The plaintiff has failed to allege an Eighth Amendment violation. His First
> Amendment claim fails for lack of causation and protected conduct. And his
> due-process claims fail because there are adequate state-law remedies available
> and because the plaintiff did not suffer a deprivation of property that he was
> entitled to.

Doc. Ent. 16 at 15.  Furthermore, defendants state:

> Defendants Abood and O'Dell acted reasonably in rejecting and disposing
> of the money orders.  And there is no clearly established law holding that a prison
> cannot enforce its security interests by prohibiting prisoners from becoming
> indebted to each other for money.  That the plaintiff was fortunate when the
> defendants mistakenly permitted him to send the money order out the first time
> does not somehow make the second, and correct, disposition a constitutional
> violation.
> As to Bradshaw, she acted reasonably in performing her job duties and
> attempting to write a ticket based the plaintiff's conduct. That she wrote the ticket
> for the wrong charge does not somehow make her conduct a violation of the
> plaintiff's constitutional rights.

Doc. Ent. 16 at 15-16.

Plaintiff responds that defendants' behavior "was unreasonable because it had been

purposefully designed to punish plaintiff for filing a grievance and remaining at JMF and not

requesting a transfer to another facility so the facility could move forward with closing." Doc.

Ent. 17 at 14.  Ultimately, JMF closed on November 17, 2007.  *See*

www.michigan.gov/corrections, "Prisons and Camps."

The defense of qualified  immunity should only be addressed after determining whether

plaintiff has stated a constitutional claim upon which relief can be granted.  "[T]he better

approach is to resolving cases in which the defense of qualified immunity is raised is to

determine first whether the plaintiff has alleged a deprivation of a constitutional right at all.

45

Normally, it is only then that a court should ask whether the right allegedly implicated was clearly established at the time of the events in question." *County of Sacramento v. Lewis*, 523 U.S. 833, 842 n.5 (1998), citing *Siegert v. Gilley*, 500 U.S. 226, 232 (1991).

Therefore, if the Court agrees with my foregoing recommendations, and in light of the Supreme Court's direction in *County of Sacramento*, the Court need only address the issue of defendants' entitlement to qualified immunity with respect to plaintiff's First Amendment retaliation claim.

The Court should conclude that defendants are not entitled to qualified immunity with respect to plaintiff's First Amendment retaliation claim against Bradshaw.

III.    **NOTICE TO PARTIES REGARDING OBJECTIONS:**

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140, 147-48 (1985), *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505, 508-09 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981).  Filing of objections that raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995); *Willis v. Sullivan*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231, American Federation of Teachers, AFL-CIO*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall not be more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

8/26/09                                     s/Paul J. Komives_____
DATE                                        PAUL J. KOMIVES
                                            UNITED STATES MAGISTRATE JUDGE

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record   by electronic means or U.S. Mail on August 26, 2009.

s/Eddrey Butts_____
Case Manager

47